Okay, we'll hear the third case, Vincent v. Garland, 21-4121, and we'll hear from the appellant. May it please the court, Sam Mezziani for Melinda Vincent. The statute forever prohibits a peaceful woman from exercising her fundamental and individual right to self-defense and is therefore unconstitutional as applied. My client Mindy Vincent has made a remarkable transformation. Fifteen years ago, she pled guilty to bank fraud. She cashed a false check at a Salt Lake City grocery store. She was addicted to drugs at the time. After her arrest, she went to treatment and she defeated her addiction. By the time of sentencing, she was no longer addicted to drugs. The late, great Judge Benson sentenced my client to probation, although the guidelines called for a sentence of imprisonment, and although the guidelines said no probation, Judge Benson, looking at all the facts and circumstances and considering the 3553 factors, assuring my client was not a threat to public safety and sentenced her to probation. But Judge Benson's faith in Mindy Vincent was correct. After her sentence, she went to college. She graduated with honors. She then got a master's degree in social work. She's a licensed clinical social worker. The state of Utah trusts her to provide mental health services to its citizens. She then obtained a second master's degree in public administration. Her personal story and her achievements have been remarkable, and she's dedicated her life to helping others. She is non-violent. Her offense was non-violent, and there's nothing at all in the record of her whole life history to suggest she has anything to do with violence, and that she would be anything but a competent and responsible gun owner as the last 15 years of her life have proven. Under this nation's history, law, and traditions, Ms. Vincent would have been able to possess arms despite her conviction at the founding, through the Civil War, through Reconstruction, through World War I, through World War II, and beyond into the second half of the 20th century. It was not until 1961 that Congress changed the statute from focusing on violent offenders to delaying that said issue in this case. What do we do with McCain? Your Honor, McCain was two things. It was not an in-depth treatment of the issue, and Bruin has changed the landscape. Bruin has given us a new test to apply. So, for example, McCain was based on the statements in the Heller opinion, and in particular those statements where the court said, and Heller was the first, the court made clear that Heller was the first case to conduct an in-depth examination of the First Amendment. And so, in Heller, Justice Scalia was very clear to say, we will consider these other exceptions, like the felon exception, if and when those cases come before us. So it was placeholder language, but now that we have Bruin, which requires us to go back and look at the history and tradition... Well, it doesn't require. Well, Bruin... It's pretty clear in the whole line of cases that there are certain areas that are explicitly preserved. Heller mentions exceptions, but Bruin does change the analysis because Bruin puts the burden on the government to establish that the proposed regulation comports with the nation's historical tradition of firearm regulation. So it changes the analysis. So that's our view of why Bruin is not... Sorry, McCain does not control the outcome of this case. Our view is that we still have to do the analysis that's required for under the Bruin case. How explicit does the language in a Supreme Court case have to be to functionally overturn one of our fairly longstanding decisions that the case is 14 years old? McCain is. Bruin's a landmark case. It's a landmark case. Again, it's... Heller was the first case to talk about... I got that, but here's my question for you. So generally, we go along... If the Supreme Court says something in dicta, we follow it as a general rule. And so the Supreme Court, various justices, I mean, if you're counting six of nine, have said something to the effect that Bruin doesn't affect 922G. So what are we supposed to do with that? What in Bruin overcomes the idea that we have six justices telling us that this case is one that's gonna lose here? I think that the language in Heller, it really isn't dicta. In other words... Well, I'm talking about Bruin itself. I mean, Justice Kavanaugh had a concurring opinion that was joined by Justice Roberts, I believe, that said that Bruin shouldn't be read to affect the right of a felon to own a firearm. That then you had Justice Alito that had his own concurrence to that effect. And then you had the three dissenting justices in that case that had something similar, some similar statement. So I mean, don't we have to have a more clear pronouncement of the law for McCain? Or, yeah, McCain to not be good law in this circuit anymore? I think that the Bruin test controls, and the fact that it came up in those other, in the concurring opinions, it still wasn't part of the analysis. The historical analysis that Bruin calls for has never been applied to this situation. Bruin set forth a test, and that's the test that needs to govern in the case. What were you, you started to say that that language in Heller was not dicta. Could you elaborate on that? Sure, when I first started working on this case, well, I thought it was dicta. It's what the court was saying, and that's why I thought it was so important. You're talking about the language on 626, that nothing in our opinion casts doubt on longstanding prohibitions on felons. Right. What the court was saying is, we're not deciding that today. And towards the end of the opinion, the court is very clear that says, we will consider that issue if and when those cases come before us. And back to the language that Your Honor just raised, there's a footnote that says those, the felon in possession is presumptively valid. And as I pointed out in the brief, the Supreme Court, when it uses the word presumption, that means something. The court is well aware that it's a legal term. Presumptions can be rebutted. So there is a presumption, but it can be rebutted. And again, we are bringing an as-applied challenge. We're not bringing a casual challenge. Didn't they say also that it's limited to law-abiding citizens in that case? And they said it like 14 times throughout the course of the opinion? Yes, and there's really four reasons why. They didn't say non-violent or violent law-abiding people or non-violent law-abiding people. They said it's limited to law-abiding citizens the right to possess arms. Correct, and in both Heller- So do we, well, they said that in Bruin. Correct, Bruin said it about 14 times. So do we just ignore that and say, well, just because somebody's been convicted of a felony that was not violent, they're still law-abiding? The petitioners in Heller and Bruin were both law-abiding. Heller, again, was the first in-depth case. And as Justice Barrett said when she was on the Tenth Circuit, the court in Heller expressly deferred analysis of the felon in possession issue. I've mentioned the presumption. That's another reason why it doesn't control. The third reason why it doesn't control is it's really inconsistent with the Bruin test. It can't be the case that Heller and Bruin, which are so focused on what is the historical analysis, that's the thrust of those cases. How do we determine the Second Amendment? Not what judges think it should mean today. We have to go back to history. We go back to the English Bill of Rights. We go to the history. It can't be the- Well, if you go back in history, you've got a situation where Catholics were not permitted to carry firearms in Maryland. I mean, is that because they were so dangerous? That goes to the dangerous, non-dangerous distinction. But what I was trying to say is that it can't be the case that history matters in every aspect, but if the legislature labels something a felony, like watching a film and recording a film on law from Utah two times, that we don't look to history. That's not the true thrust of Heller and Bruin. The true thrust of Heller and Bruin is history is gonna control these cases. And then fourth, my client is law-abiding. Dick Heller, in the Heller case, was not caught with a firearm in his house. He wanted to possess a firearm in his house, and he filed a lawsuit. My client was not caught with a firearm. She came to court. She believes she has a Second Amendment right, and she is law-abiding. She's abiding by the law that she's now saying doesn't apply to her. And she has an offense in her past, but it's a non-violent offense. And as she is here before you today, she is a law-abiding citizen. Did, oh, go ahead. Did Bruin, I just, very quickly, did Bruin overrule the language on page 626 of Heller? I'm sorry, can you? Did Bruin overrule the language on 626 in Heller? Are you saying that you had this language that you were identifying what it meant in Heller, and then you said, but Bruin changed the landscape. So I'm not sure, are you saying that Bruin overruled that language on 626 in Heller? No, I'm saying that Heller's just saying that issue's reserved for another day. So, when you said that Bruin changed the landscape, you know, back to Judge Carson's question, none of our, we have several iterations of what it means for a Supreme Court to have implicitly overruled our cases. Unfortunately, I don't think any of those use the word changing the landscape. But, so what does it actually mean? Because in McCain, we didn't identify anything that was consistent or inconsistent with the historical test in Bruin. What we said was, as we often do, well, we thought, the McCain panel thought it was dicta, and we said, like Judge Carson said, we generally think that when a Supreme Court speaks, whether it's dicta or wholly, it really doesn't matter particularly. We generally adhere to that. So, what in particular, if you look at the content of McCain, was implicitly or explicitly abrogated in Bruin? Well, if I recall right, the McCain paragraph on that issue was only two sentences, and after Heller, we still had courts applying rational basis, and we had courts still applying interest balancing, and Bruin made clear, Bruin just set forth a new test. But that's not in McCain. I mean, you're saying that cases post-McCain shed a gloss on what McCain said? I mean, McCain said whatever it said. You're right, it was a very short opinion. We said that we're gonna follow the dicta in Heller, and so Bruin changed the landscape, but I don't understand how changing the landscape has anything to do with actually what the court said in McCain. It's our view that Bruin set forth a new test and a new analysis that courts should apply, and that in light of the landmark Bruin case that sets forth a new analysis, simply looking at the language in Heller that said we're gonna decide this issue on another day is no longer sufficient, and we're asking the court to reevaluate its prior precedent in light of the landmark Bruin decision. I'd like to preserve the rest of my time unless there's further questions. Okay, we'll, you can't stop this club. Do you have any questions? Yeah, I do. This is going against your rebuttal. This is not, we're not analyzing your rebuttal. So, you would agree that Heller was a decision based on history and tradition? Yes. Right? So, I mean, isn't it fair to say that Bruin really didn't change anything? I mean, Bruin didn't change Heller. Bruin was the next, or actually, there was another case. McDonald, arguably, was next, and then Bruin comes along. Bruin didn't change anything, and McDonald or Heller, which both relied on history and tradition, right? I think the thing that, there was still confusion, and even when we litigated this in the district court, I was still arguing interest balancing. There was still confusion throughout the nation on that issue. Don't change my question. So, because I'm just telling you, it seems to me that Bruin didn't change anything as far as Supreme Court jurisprudence went. The Supreme Court had never blessed the way the lower courts were addressing things on the two-factor kind of test. That didn't come up until Bruin. And so, the Supreme Court, since Heller, has been looking at these things on a historical basis. So, as far as needing to look at history and tradition, Bruin didn't change anything. I see the court's point, and I would only say that, at least for someone in practitioner shoes, I think Bruin made the test much more clear when it expressly stated, which might have been there before, but I think it clarified things, that, yes, now the burden, if you fit within the Second Amendment, now the burden is expressly on the government to come in and find a statute that is now analogous to what it's trying to enforce. So, it may not have changed everything, but it made it much more clear. But it did set forth a succinct analytical test that we should follow. Right, okay. I'm not gonna answer his questions. I'm not gonna answer all of them. You're what? You finished? I'm done, yeah. I'm just, yeah, I just wanted you to be able to answer his questions. Yeah, no, I'm finished. All right, thank you. Thank you. Good morning, Your Honor. It's me, please, the court. Kevin Soder from the Department of Justice. You wanna move up the microphone there? Just move it up, yeah. We see you're way above it. Thank you, Your Honor. Let's try again. Good morning, Your Honor. Kevin Soder from the Department of Justice for the government. I'd like to begin where the court's questions did with this court's decision in McCain, as well as its progeny, which we submit control the outcome here. As the district court correctly recognized, this court, like the Fifth and Eleventh Circuits, has long understood the Supreme Court's specific statements in Heller and McDonald regarding felon dispossession laws as categorically upholding the federal felon dispossession law that Ms. Vincent seeks to challenge in this case. That law is not subject to the sort of individualized inquiry that Ms. Vincent is asking for here, and that's a dispositive basis for resolving this case. Well, should the district court have delved back into the history more so than just say, I'm gonna follow McCain? I don't think it was necessary for the district court, Your Honor, just like it's not necessary for this court. Of course, a court always can provide additional reasons supporting the conclusion, but district courts and courts of appeals are busy places, and when a clear rule has been announced, like the rule that was announced in McCain, and it was followed in the subsequent cases that this statute simply is constitutional in all of its applications full stop, courts don't need to reanalyze the underlying basis for that. And of course, the underlying basis was this court's having read the statement in Heller on pages 625 to 626 differently than Ms. Vincent's counsel is proposing reading those statements today. This court read the statement that the court's decision was not casting doubt on longstanding prohibitions on possession of firearms by felons as foreclosing challenges to that exact law. And that's a point that not only does the majority opinion in Bruin reaffirm in several respects, I'm happy to discuss those, but of course, as many of Your Honor's questions were suggesting, there were three justices who participated in the majority in addition to the justices in dissent who specifically identified this passage of Heller and MacDonald as remaining good law. Can we, by the same, by the lack of joinder of the other three justices in the majority assume that they disagree? No, Your Honor, I think the best evidence of where sort of each justice is as far as counting them up is in looking to the past opinions that they've written. Of course, we recognize that then Judge Barrett wrote an opinion that the plaintiff is relying on here, but the other two justices in the majority, Justices Gorsuch and Thomas, joined Justice Alito's opinion in the previous New York State and Rifle and Pistol Association case in which he again identified the felon dispossession law as constitutional under the Second Amendment. And then of course, if we look to the Bruin, the court's decision itself throughout, it reflects this principle that law-abiding citizens can be deprived of arms. And I'd point in addition to among those 14 references to law-abiding citizens throughout the decision, which as Your Honor noted, were not qualified by violent non-law-abiding citizens being excluded, in footnote nine, the court specified why it was saying that it wasn't casting any doubt on shall issue licensing regimes, which are the sort of regime used in 43 states, not by New York and by several other states that was invalidated in that case. And what the court said in footnote nine is that those regimes are constitutionally permissible because they are, quote, designed to ensure only that those bearing arms in the jurisdiction are in fact law-abiding, responsible citizens. The law challenged here today serves exactly the same purpose and is valid for the same reason. Can I ask you about the first of those two reasons that you gave, those separate opinions? Do you have a case that says that we can look to what a separate opinion says that majority opinion means? Generally, we have sort of an unwritten rule that our opinions speak for themselves, the Supreme Court's opinions speak for themselves, whether it's the author or a panel member really has no better position, perspective, to say what the majority opinion means than anybody else. And so, but do you have a case? I don't know that anybody cited anything. I'm not immediately aware of a case on the exact point of when a concurrence helps sort of settle what the law is, but I think in this case, it's not really necessary to give the concurrences themselves sort of dispositive weight because the concurrences are simply articulating what's clear from the majority opinion itself, which is that the majority opinion is a reiteration of Heller, it's an application of Heller, and the court takes pains throughout the decision, as I think some of Judge Carson's questions were mentioning to say that what it was doing was re-articulating Heller's text and history methodology. Yeah, exactly, not the language of 626, which is really the only part in Heller that McCain relied on. So doesn't that point hurt you rather than help you? If Bruin is relying on the historical test that was set forth in Heller and not upholding the language in 626 that is the only language pertinent to McCain, why doesn't that suggest that Bruin really did upend the law that was the predicate for McCain? I think because, of course, there's no standard that the Supreme Court needs to say every aspect of the law in every case it decides. It's sort of an extraordinary starting point that we have a specific statement about this law in Heller that is reiterated in McDonald and framed in McDonald as reassurances, and the court doesn't need to say in every single case it decides after that, that this is a feature of the Second Amendment right, that it has this exception that was well understood by this court in Heller, and the court, of course, had good, sorry, in McCain, and the court, of course, had good company when it decided McCain. It was following the lead of the Fifth Circuit, which had recognized that the right embodied in the Second Amendment is an individual right before Heller. The Eleventh Circuit issued a similar decision, and when he was on the D.C. Circuit, then Judge Kavanaugh issued an opinion that we cited in our, a dissenting opinion that we cited in our brief, where he similarly recognizes that what the Supreme Court was doing in the passage in Heller at pages 625 to 626 was, quote, that it affirmatively approved a slew of gun laws, including the felon dispossession law, under the text and histories framework that was set forth in Heller. Would you agree that if we affirmed on the idea that this was stare decisis, that we had decided it before, that the Supreme Court hadn't changed anything, that if and when it went to the Supreme Court, that there would be no stare decisis analysis even necessary there, based on the various judges' separate writings in concurrence and in dissent? I want to make sure I understand the question. I think that what the writings we have from the Supreme Court reflect is that the court has recognized there is an exception for felon dispossession laws. Well, you're not saying that that question was necessary to the disposition of Heller, McDonald, New York, any of those, are you? In Heller, actually, the court specifically said that it was assuming that Mr. Heller was not disqualified from possessing arms then he would be entitled to a firearm. So I think that is incorporated into the holding of Heller. Of course, the Supreme Court reserved for itself the possibility of expounding upon the historical justifications for these exceptions should they come before the Supreme Court, but it also made clear what the answer was on the bottom line, and that was the answer that this court followed in McCain, that it followed in a series of unpublished decisions following McCain, including the United States decision that we cited. That's the practical answer, but from a doctrinal standpoint, I guess my point is that everything we're talking about as being, as supporting our decision in McCain is dicta, is a statement that didn't have, that wasn't signed on by a majority of the court, one of those things that wouldn't require the Supreme Court to first determine if they had to apply the doctrine of stare decisis if this case were to go up. Your Honor, I think the Supreme Court has said what would happen if this case were to go up. That's not, that's not answering. I agree that they've expressed a lot of opinions, but tell me your opinion. I mean, do they, if it goes up, do they, first thing they say, well, we've got to determine if we're bound by the three concurring opinions that are floating around out there and the dissenting opinion in Bruin? Your Honor, I think the Supreme Court likely would begin with the passage in Heller that it reiterated in McDonald and would likely also recognize the views stated more explicitly in the concurrences in Bruin. It may go on to explain why the text and history support that outcome, and I'm happy to address any questions you may have on that should it get there, but of course, there's also the recognition that I think this court has made that when the Supreme Court announces clear instructions, and especially when this court then reiterates those clear instructions, it's just not sort of necessary to go beyond that, and whether the Supreme Court has the same set of doctrines about what it calls its own, if it wants to call it its own dicta, it's different than the precedent this court has, which I think, as Judge Timkovich's concurrence in McCain mentioned, the courts of appeals are not supposed to sort of pick and choose the directions of the Supreme Court as if ordering off of a menu and fear that the McCain court already recognized what direction the Supreme Court was giving. I think if there are no further questions about the effect of McCain, I'm happy to answer any questions the court may have about the text and history inquiry as an initial matter. Otherwise, we rest on our briefs on that. Thank you. Thank you. Thank you. Thank you. I want to go back and address the McCain issue, and I want to do that first by stating in the Rahimi case in the Fifth Circuit, there was a Fifth Circuit case on point. It was U.S. v. McGinnis, 956 F. 3rd, 747. I'm sorry, say that again. U.S. v. McGinnis, 956 F. 3rd, 747. It was a Fifth Circuit case from 2020. That case involved a domestic violence restraining order. It was an in-depth analysis of the issue as opposed to the McCain case. Well, if you do the in-depth analysis, aren't we going to find a whole lot of areas where various groups were declined the right to possess arms in our country as well as other countries? It's not a one-way street on the issue of historical disposition, if you could, dispossession. Sure, thank you, and there's a long history, and I can talk about all the statutes and the history of that, but the point I was making with the McGinnis case is that in Rahimi, Rahimi was of the view that Bruin upended that case, and in fact, the government conceded that that prior Fifth Circuit case was no longer good law after Bruin, so it conceded it in the Fifth Circuit, and I'm basically advocating that something similar should obtain in this case. I'd also just want to, as the Court's well aware, that Judge Timkovich dissent in McCain, where he said, my first point is that the felon disposition dictum may lack the longstanding historical basis that Heller ascribes to it, and so Bruin really does set forth the test, and we didn't get into it much today, but we think we went under Bruin. We think Ms. DeVinson is part of the people, and we think that there's nothing analogous, especially to a longstanding social problem like fraud that the founders could have enacted legislation against, and so we think we went under the Bruin test, and our request is that the Court apply Bruin to this case, thank you. Thank you, did you cite the McGinnis case in your briefs? No, we did not, I believe. Could you give us a 28-day letter within three days? Yes, Your Honor. And all we want, no argument, is just the cite to the McGinnis case that you cited. Thank you. Before you do that, did the government cite that case? The McGinnis case? I don't believe the government did, but I can't speak for the government. No, Your Honor, if I could very briefly address the case, I believe that case relied on the second step of the pre-Bruin framework, and that is why it's not related.  This matter will be submitted.